IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *IN RE* SUBPOENAS TO ADAM KINCAID AND THE NATIONAL REPUBLICAN REDISTRICTING TRUST | Miscellaneous Action No. 1:22-mc-67 (JEB) (RMM) |
| THE LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GREG ABBOTT, et al.,<br><br>Defendants. | *Underlying Action* No. 3:21-cv-00259 (DCG-JES-JVB) (W.D. Tex.) |

**UNITED STATES' MEMORANDUM IN OPPOSITION TO ADAM KINCAID'S AND THE NATIONAL REPUBLICAN REDISTRICTING TRUST'S MOTIONS TO QUASH AND FOR PROTECTIVE ORDERS**

## INTRODUCTION

The National Republican Redistricting Trust (NRRT) and its President and Executive Director, Adam Kincaid, were key players in Texas' 2021 redistricting process.  They were not merely informal consultants, lobbyists, or groups with a heightened interest in the outcome. Instead, the NRRT provided "map-drawing and redistricting consulting services" in connection with Texas' redistricting, via a law firm (The Gober Group) engaged by several members of the Texas delegation to the U.S. House of Representatives.  *See* Kincaid Mot., ECF No. 1; *see also* Kincaid Decl. ¶¶ 6-7, ECF No. 1-2.  Ultimately, the NRRT—and Mr. Kincaid specifically—held the pen used to draw lines across Texas that were adopted in substantial part in the State's 2021 Congressional plan.

Mr. Kincaid nonetheless asks this Court to quash a deposition exploring his role in relation to consolidated constitutional and Voting Rights Act challenges to Texas' 2021 Congressional plan, and NRRT asks the Court for a protective order limiting the scope of its deposition.  Those requests should be rejected.  Mr. Kincaid has firsthand knowledge that is not coterminous with the testimony of NRRT's Rule 30(b)(6) representative relevant to the question whether Texas' redistricting maps have a discriminatory purpose or result.  Moreover, none of the anticipated assertions of privileges raised in Mr. Kincaid's motion should stand as an obstacle to Mr. Kincaid's or NRRT's depositions.  And First Amendment and trade secrets privileges do not bar NRRT's testimony.  The motions should be denied.

## BACKGROUND

On December 6, 2021, the United States filed a Voting Rights Act enforcement action challenging Texas' 2021 Congressional and State House redistricting plans.  *See* U.S. Compl., *United States v. Texas*, No. 3:21-cv-299 (W.D. Tex. Dec. 6, 2021), ECF No. 1; *see also* U.S.

1

Am. Compl., *LULAC v. Abbott*, No. 3:21-cv-259 (W.D. Tex. June 6, 2022), ECF No. 318.

Relevant to this matter, the United States specifically alleges that the 2021 Texas Congressional

plan has a discriminatory purpose and discriminatory result. *See* U.S. Am. Compl. ¶¶ 197-199.

The United States' claims have been consolidated with other actions, including the lead case

brought by the League of United Latin American Citizens (LULAC). *See* Order Consolidating

Case, *LULAC v. Abbott*, No. 3:21-cv-259 (W.D. Tex.), ECF No. 83.

In the course of fact discovery, LULAC (represented by MALDEF) issued a Rule

30(b)(6) deposition subpoena to NRRT and an individual-capacity deposition subpoena to its

Executive Director, Adam Kincaid.[1]  *See* Kincaid Decl. ¶¶ 2-4.  The United States plans to

participate in those depositions.  NRRT became involved in Texas redistricting through a

contract to provide Legal Support Services to The Gober Group in its representation of several

members of the Texas Congressional delegation in connection with Texas' decennial

redistricting.[2]  *See* NRRT Contract, ECF No. 1-19; Kincaid Decl. ¶ 6.  Chris Gober, Managing

Partner of The Gober Group, testified at his July 12, 2022 deposition that he "chose to use Mr.

Kincaid" as the person with the "technical expertise" to "personally use redistricting software"

and that "Mr. Kincaid drew maps at [his] direction on behalf of [his] clients."  Gober Tr. at

52:15-53:4 (July 12, 2022) (Ex. 1).  Mr. Gober further testified that Mr. Kincaid "had the mouse"

when drawing Congressional maps.  Gober Tr. at 52:15-18.  According to Mr. Gober, "Mr.

Kincaid and NRRT" created maps with him in "mutual agreement, [with] them as our

---

[1] This Memorandum uses the party name, which is functionally identical to Mr. Kincaid's and
NRRT's references to "MALDEF."

[2] The Gober Group is a law firm that describes itself as having "unique expertise navigating the
intersection of business, law, politics and, of course, relationships," and assisting clients with
"achieving a strategic public policy objective, navigating a 'bet the company' issue, or
competing at the ballot box."  *See* The Gober Group, *Expertise*, https://perma.cc/D3VV-MR7V.

subcontractor." Gober Tr. 55:12-17. The maps were "created by Mr. Kincaid and NRRT . . . to be presented to the [] State Legislature," Gober Tr. 55:13-17 (Ex. 8), and "to show a lot of the objectives of [Gober's] clients," Gober Tr. at 55:25-56:1. After gaining the consent of Mr. Gober's clients in the Congressional delegation, the maps were transmitted as "unified maps" to the State Senate and State House, Gober Tr. 56:1-10, and "[t]he charge would be change this to the extent that it is necessary to comply with the Voting Rights Act, but try to respect these lines as much as you can because this is what the current Members of the delegation desire," Gober Tr. 57:8-12. Mr. Gober also testified that Mr. Kincaid provided non-legal analysis,[3] Gober Tr. 53:19-54:3, and that Mr. Kincaid would have knowledge of what data were available for redistricting purposes, Gober Tr. 254:21-255:4.

The United States plans to participate in the depositions of NRRT and Mr. Kincaid pursuant to the subpoena by LULAC, and has participated in the meet and confer process between the parties, NRRT, and Mr. Kincaid. The depositions were scheduled to occur on July 13 (but did not due to the filing of the instant motions), and fact discovery closed on July 15. Motions for summary judgment in *LULAC v. Abbott* are due on August 5, and oppositions to those motions are due on August 19. Trial is scheduled to begin on September 28.

## LEGAL STANDARD

In general, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Relevance is broadly construed. *See, e.g., Washington v. Thurgood Marshall Acad.*, 230 F.R.D. 18, 21 (D.D.C. 2005).

---

[3] Mr. Kincaid is not an attorney. *See* Gober Tr. 53:21-22.

A court may order limitations on discovery for good cause to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," Fed. R. Civ. P. 26(c)(1), and a Rule 45 subpoena may be quashed or modified if it "subject[s] a person to undue burden," Fed. R. Civ. P. 45(d)(3)(A)(iv).  "The quashing of a subpoena is an extraordinary measure, and is usually inappropriate absent extraordinary circumstances." *Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 102 (D.D.C. 2005).

 "The party requesting a protective order must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one." *Huthnance v. District of Columbia*, 255 F.R.D. 285, 296 (D.D.C. 2008) (quoting *Fonville v. District of Columbia*, 230 F.R.D. 38, 40 (D.D.C. 2005)) (alteration omitted).  "The moving party has a heavy burden of showing 'extraordinary circumstances' based on 'specific facts' that would justify such an order." *Alexander v. F.B.I.*, 186 F.R.D. 71, 75 (D.D.C. 1998) (alteration omitted).

## ARGUMENT

I.    **Plaintiffs May Take a Rule 30(b)(1) Deposition of Mr. Kincaid and Rule 30(b)(6) Deposition of NRRT.**

   A.    **NRRT's Designation of Mr. Kincaid as Its Rule 30(b)(6) Representative Did Not Defeat the Need for Mr. Kincaid's Individual Testimony.**

Mr. Kincaid is incorrect to equate his testimony in an individual-capacity deposition to that of NRRT's Rule 30(b)(6) designee.  Mr. Kincaid speculates that any questions that could be asked of him in an individual capacity would "necessarily be covered" in the Rule 30(b)(6) deposition of NRRT, for which NRRT has designated him as its representative.  Kincaid Mot. at 9.  This argument fails to recognize the substantially different scope, purpose, and effect of an individual-capacity deposition under Rule 30(b)(1) and the deposition of a designated corporate

representative under Rule 30(b)(6).  It assumes, without a factual basis, that the questions posed to Mr. Kincaid on these topics would be identical.  And it elides the distinction between the questions or topics "covered" in a deposition and the responses a witness may give as their sworn testimony based on whether they are speaking on behalf of an entity or in their individual capacity.  Mr. Kincaid's motion to quash should be denied.

The scope and purposes of a Rule 30(b)(6) deposition and an individual-capacity deposition are distinct.  "It is well settled that a witness appearing pursuant to a Rule 30(b)(6) notice has a unique status and testifies as the entity, not as an individual," making a Rule 30(b)(6) deposition "substantially different from a witness's deposition as an individual." *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, No. 01-cv-3016, 2002 WL 1835439, at *2 (S.D.N.Y. Aug. 8, 2002) (internal citation and quotation marks omitted).  Unlike an individual's deposition, "30(b)(6) witnesses . . . are not expected to base their testimony on matters entirely within their personal knowledge." *Buie v. District of Columbia*, 327 F.R.D. 1, 8 (D.D.C. 2018).  On the other hand, individual knowledge, and personal intent, experience, and actions, are of particular import to this matter, in which LULAC and the United States allege that the 2021 Texas Congressional plan is intentionally discriminatory against minority voters. *See, e.g.*, *Texas v. United States*, 887 F. Supp. 2d 133, 161 n.32 (D.D.C. 2012) (three-judge court) (describing "potential discriminatory intent in the selective drawing of [Congressional District] 23"), *vacated and remanded*, 570 U.S. 928 (2013); *id.* at 178 ("[T]he incredible testimony of the lead House mapdrawer reinforces evidence suggesting mapdrawers cracked [precincts] along racial lines to dilute minority voting power.").

Precisely because Rule 30(b)(1) and Rule 30(b)(6) depositions are substantially different, "with good reason, courts have rejected the argument that a Rule 30(b)(6) deposition is

unnecessary or cumulative simply because individual deponents—usually former or current employees of the entity whose Rule 30(b)(6) deposition is sought—have already testified about the topics noticed in the Rule 30(b)(6) deposition notice." *Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 285 F.R.D. 481, 487 (N.D. Cal. 2012); *see also, e.g.*, *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-cv-16, 2009 WL 2870622, at *2 (E.D. Wis. Sep. 2, 2009); *Alfadda v. Fenn*, 149 F.R.D. 28, 30 (S.D.N.Y. 1993).  This distinction is no less applicable where the entity designates as its representative an individual already subpoenaed as a fact witness—indeed, collapsing the distinction in that circumstance would create "substantial potential for over-reaching," including that "any entity that wanted to limit the testimony of an individual could accomplish that goal by designating the individual as a 30(b)(6) witness." *Sabre v. First Dominion Cap., LLC*, No. 01-cv-2145, 2001 WL 1590544, at *1 (S.D.N.Y. Dec. 12, 2001); *see also, e.g.*, *Cincinnati Ins. Co. v. Desert State Life Mgmt.*, No. 18-cv-981, 2020 WL 5369061, at *5 (D.N.M. Sept. 8, 2020).  NRRT and Mr. Kincaid have not identified any decision providing the relief they seek, much less where the individual subpoenaed was such an instrumental player in the underlying facts.

Because NRRT elected to designate Mr. Kincaid as its representative, LULAC and the United States have also made significant efforts to minimize the burden on Mr. Kincaid and streamline the two depositions, including offering to conduct both in a single day.  *See* Kincaid Mot. at 3.[4]  That offer stands.  Thus, LULAC and the United States have every incentive not to repeat or rehash questions that were fully answered during an earlier deposition.  In other words, Mr. Kincaid's stated concern that his deposition will be wholly duplicative of NRRT's

---

[4] NRRT was not obligated to name Mr. Kincaid as its Rule 30(b)(6) designee, and LULAC and the United States had no guarantee that they could secure Mr. Kincaid's relevant testimony based on a subpoena to NRRT alone.

deposition rests on the assumption that plaintiffs would take a deposition in a manner contrary to their own interests. This does not warrant prospectively quashing Mr. Kincaid's deposition in its entirety.

The Federal Rules of Civil Procedure do not put parties to the choice of having a key witness testify as either an entity representative or in an individual capacity. The Court should deny Mr. Kincaid's attempt to do so by other means.

**B.      There Is No Basis to Limit Plaintiffs' Ability to Question Mr. Kincaid Prospectively.**

Mr. Kincaid further requests "that the scope of his deposition be limited to the Topics provided in [LULAC]'s 30(b)(6) notice to NRRT," effectively conceding that the two subpoenas are not redundant. Kincaid Mot. at 12. That request should also be rejected. Mr. Kincaid speculates that there is a "possibility of 'annoyance, embarrassment, and oppression'" if the topics are not so limited, Kincaid Mot. at 12 (alteration omitted), suggesting without a factual basis that LULAC and the United States "will attempt to delve into irrelevant matters in an effort to malign him." *Id.* But Mr. Kincaid does not explain why topics beyond the scope of the NRRT subpoena will be uniformly oppressive, and the prospective limitation on discovery he proposes is inconsistent with the "liberal" pretrial discovery provided for in the Federal Rules, including for third parties. *See, e.g.*, *FTC v. Sysco Corp.*, 308 F.R.D. 19, 23 (D.D.C. 2015); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 30 (1984).

Mr. Kincaid's arguments do not carry his burden to make the "specific demonstration of facts" showing the need for a protective order, most notably the harm that would be suffered without placing strict prospective limits on the scope of questioning. Instead, he speculates that having to testify about "redistricting efforts in states other than Texas" could "malign him," and suggests that "it is *possible* these types of questions would be designed to improperly seek

7

information that could be relevant to other redistricting cases outside of Texas." Kincaid Mot. at

12 (emphasis added). Speaking only in possibilities, Mr. Kincaid effectively concedes that he

has no concrete basis to accuse LULAC and the United States of seeking his deposition or

raising any potential line of inquiry for an improper purpose. Nor does he explain why his

truthful testimony about redistricting matters would "malign him." The mere specter of

hypothetical future discovery excesses does not warrant prospective limitations. *See, e.g.*,

*Alexander*, 186 F.R.D. at 75.

      Even Mr. Kincaid's hypothetical example of questions that touch upon redistricting in

states other than Texas demonstrates the inappropriateness of curtailing inquiry before his

deposition has even begun. Questions concerning his prior redistricting experience, his approach

to redistricting, and the considerations he brings to bear on creating redistricting maps could

require broad responses, but that does not make such testimony irrelevant to his work concerning

Texas in 2021.[5] LULAC and the United States cannot know in advance what Mr. Kincaid will

testify to, let alone how topics may or may not interconnect, and litigants have a right to probe

such information in a live deposition format. By contrast, a protective order strictly limiting

inquiry into these topics before a single question has been asked would lay a minefield, leading

to disruptive objections any time the response to a question may touch on information extending

beyond the most recent Texas redistricting cycle and potentially obscuring relevant testimony.

No need for such a limitation has been shown.

      To be sure, the United States is not interested in using an individual-capacity deposition

of Mr. Kincaid to rehash questions appropriately asked and answered during his Rule 30(b)(6)

---

[5] That some of his redistricting experience may have come "outside of his employment at
NRRT," Mot. at 12, also further demonstrates why quashing Mr. Kincaid's individual subpoena
and limiting plaintiffs to deposing NRRT's entity representative is not appropriate.

deposition or to delve into irrelevant matters.  While some general topics may overlap, the differing nature of the depositions and the different information that plaintiffs can elicit from Mr. Kincaid at his individual deposition, including inquiry into his broader redistricting experience, make an individual-capacity deposition of Mr. Kincaid wholly appropriate, and make any limitations on his deposition to prevent speculative and ill-defined harms unnecessary.  The Court should accordingly deny Mr. Kincaid's motion.

## II.     Hypothetical Assertions of Privilege Are Not Grounds to Quash a Deposition Subpoena.

Mr. Kincaid also incorrectly argues that the potential need to assert privileges on NRRT's behalf, or the need to ascertain the scope of the privilege between NRRT and The Gober Group, requires quashing his deposition subpoena entirely or delaying his deposition until any hypothetical disputes about that privilege are resolved.  Now that the deposition of The Gober Group's Managing Partner Chris Gober is complete as of July 12, the need to ascertain the boundaries of this privilege (which Mr. Kincaid asserted based on NRRT's relationship with The Gober Group) should not stand as an obstacle to Mr. Kincaid's deposition.[6]  In any event, Mr. Kincaid has presented no reason why hypothetical assertions of attorney-client privilege should bar his deposition, or why he and his counsel would be unable to assert them during the course of a deposition, as is typical and provided for in the Federal Rules.  *See* Fed. R. Civ. P. 30(c)(2) (permitting an instruction not to answer when necessary to preserve a privilege).  Furthermore, there is no indication that Mr. Gober provided bona fide legal advice to his clients, rather than political or policy guidance or lobbying in shaping Texas's 2021 Congressional redistricting plan.  *See, e.g.*, *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998); *see also* Gober Tr. 55:22-

---

[6] Mr. Gober did not seek to quash or limit his own deposition on the basis of these assertions of privilege.

56:10 (describing delegation of compliance function to state officials); *id.* at 55:13-17

(explaining that the maps were "created by Mr. Kincaid and NRRT. . . to be presented to the []

State Legislature"); *id.* at 165:2-15 (describing the provision of "legal advice, but from a . . .

policy perspective").

Moreover, to the United States' understanding, Mr. Kincaid would be represented by the

same counsel at his individual-capacity deposition and as representative for NRRT.  He does not

explain why counsel would be adequately equipped to assert NRRT's privileges at his Rule

30(b)(6) deposition, but the same counsel would not be able to do so as appropriate in his

individual-capacity deposition.  Mr. Kincaid's subpoena should not be quashed or modified

based on the possibility that some questions may implicate assertions of attorney-client privilege.

### III.   The Plaintiffs Should Not Be Barred from Seeking Relevant Information from NRRT By a Protective Order.

NRRT seeks additional and unwarranted protective orders limiting the scope of its

deposition on three further grounds.  First, they claim the Rule 30(b)(6) topics notice in NRRT's

entity deposition "may be read" in a way that is overbroad.  Kincaid Mot. at 14.  Second, they

claim "communications and activities within the broader NRRT organization outside of Texas"

may be undiscoverable under the First Amendment.  *Id.* at 15.  And third, they claim such

information is protected from disclosure as "trade secrets."  *Id.* at 15, 17.  They have not carried

their burden to show a protective order is necessary on any of these grounds.

### A.   The Rule 30(b)(6) Topics Noticed to NRRT Are Not Overbroad.

In the first instance, while NRRT suggests that multiple Rule 30(b)(6) topics are

overbroad, it does not identify which ones it is challenging or the reasons why it believes they

are overbroad or require limiting to be relevant, with one exception.  To the extent NRRT has not

10

identified which topics it is challenging or the reasons they are overbroad, the Court should deny the motion for a protective order.

The only topic that NRRT specifically challenges is Topic 2, which calls for:

Research, evaluation, or analysis conducted by NRRT related to the characteristics (demographic, political, or otherwise) of voters in Texas or voters moved into or out of any district for Texas House of Representatives, Texas Senate, Texas State Board of Education, or Texas seats in the U.S. House of Representatives in any redistricting proposals seen by NRRT between January 1, 2021 and October 25, 2021.

NRRT's objection appears to be to the use of the phrase "related to," based on the notion that this phrase "arguably negates the tailoring of the remaining Topic" and potentially extends its reach to information "only tangentially related to Texas." Kincaid Mot. at 15. But the topic on its face does not extend beyond Texas. And NRRT does not identify, even in broad terms, what type of research or analysis it has done that is "tangentially related to" Texas but not sufficiently "related to" Texas to fall within the scope of a proper Rule 30(b)(6) notice. The clarity of this topic stands in stark contrast to *Stewart v. Mitchell Transportation*, No. 01-cv-2546, 2002 WL 1558210 (D. Kan. July 11, 2022), on which NRRT relies, which quashed in part a document subpoena that called for "all information" and "all documents" regarding the issuing party. *See id.* at *7. And even there, the court quashed the subpoena only where it extended beyond "discrete documents." *Id.* at *4. Fundamentally, it requires no "mental gymnastics" to determine what types of research and analyses Topic 2 calls for here. *Cf. id.* There is no need for a protective order in light of this clearly described topic calling for facially relevant information.[7]

---

[7] To the extent NRRT intends to challenge other topics as insufficiently relevant to Texas redistricting, its objection is similarly answered by the face of the topics, each of which pertains directly to Texas redistricting: to the creation of Texas' redistricting maps (Topics 1-2), strategy

**B.  The First Amendment Does Not Prevent Inquiry into NRRT's Redistricting-Related Communications.**

NRRT next argues that the First Amendment bars inquiry into "communications within NRRT and between NRRT and the Republican Party, its state affiliates, and other aligned entities and individuals."  Kincaid Mot. at 16.  The core of the First Amendment privilege is that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama,* 357 U.S. 449, 460 (1958).  Such claims are evaluated under a balancing test: if the party asserting the privilege has made a *prima facie* showing that disclosure would implicate its First Amendment associational rights, *Perry v. Schwarzenegger*, 591 F.3d 1147, 1164-65 (9th Cir. 2010), courts "balance the burdens imposed on individuals and associations against the significance of the government interest in disclosure and consider the degree to which the government has tailored the disclosure requirement to serve its interests."  *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n*, 333 F.3d 168, 176 (D.C. Cir. 2003); *see also, e.g.*, *Perry*, 591 F.3d at 1164-65.[8]  Here, that inquiry reveals that a protective order is not warranted.

---

around Texas redistricting (Topic 3), specific named Texas redistricting plans (Topics 3-7), the release of 2020 census data to Texas and use of that data for redistricting (Topic 8), communications with Texas officials (Topic 9), and NRRT's document retention policy (Topic 10).

[8] NRRT and Mr. Kincaid rely primarily on *Black Panther Party v. Smith*, 661 F.2d 1243 (D.C. Cir. 1981), which was subsequently vacated, 458 U.S. 1118 (1982) (mem.).  While the reasoning in *Black Panther Party* has not been explicitly "rejected or abandoned," *Int'l Action Center v. United States*, 207 F.R.D. 1, 3 n.6 (D.D.C. 2002), the D.C. Circuit's more recent decision regarding compelled disclosure of political affiliations in *AFL-CIO v. FEC*, 333 F.3d 168, 175-79 (D.C. Cir. 2003), neither cited *Black Panther Party* nor explicitly adopted its framework.  In light of the somewhat unsettled law in this circuit and the fact that this is a civil discovery subpoena as opposed to a criminal or regulatory investigation, the United States cites *Perry*, which is generally consistent with both *Black Panther Party* and *AFL-CIO*, as well as the approach of other circuits, *see Brock v. Local 375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 n.1 (9th Cir. 1988) (collecting cases).  *But see Ohio A. Philip Randolph Inst. v.*

In the first instance, it is doubtful that NRRT has made "a *prima facie* showing of

arguable First Amendment infringement," *United States v. Trader's State Bank,* 695 F.2d 1132,

1133 (9th Cir. 1983). "This *prima facie* showing requires [the subpoena recipient] to

demonstrate that enforcement of the subpoenas will result in (1) harassment, membership

withdrawal, or discouragement of new members, or (2) other consequences which objectively

suggest an impact on, or 'chilling' of, the members' associational rights." *Brock v. Loc. 375,*

*Plumbers Int'l Union of Am., AFL-CIO,* 860 F.2d 346, 350 (9th Cir. 1988). This typically

requires "objective and articulable facts, which go beyond broad allegations or subjective fears."

*Id.* at 350 n.1.

NRRT does not raise any allegations or point to any factual basis to believe it risks

harassment, membership withdrawal, or discouragement of new members if it is not shielded

from deposition questions, and proceeds entirely under the second prong of "other

consequences" chilling its associational rights. But it raises no "concrete facts" demonstrating

*why* its associational rights would be chilled. Rather, Mr. Kincaid's declaration makes only the

conclusory assertions that answering deposition questions would "drastically and adversely

affect how [he] communicat[es] internally in the future," and "have a deleterious impact on the

functioning of NRRT as well, and would deter full and honest discussions between NRRT and

other aligned organizations and individuals." Kincaid Decl. ¶ 11. Neither Mr. Kincaid nor any

other source explains *why* answering deposition questions in this case would have these claimed

effects, nor does anything in the record connect these predicted adverse impacts to a chill on

---

*Householder*, No. 1:18-cv-357, 2019 WL 3288170, at \*3 (S.D. Ohio Jan. 30, 2019), *vacated as moot*, 802 F. App'x 185 (6th Cir. 2020) (describing *Perry* as "more rigid" than *Black Panther Party*). The balancing framework is appropriate, but the First Amendment should not prevent or limit Mr. Kincaid's deposition here under any conceivable test.

*associational rights* from answering deposition questions.  The lack of a demonstration that the described chill arises from a reluctance, fear, or inability to exercise *associational* rights precludes finding even an "insubstantial" assertion of First Amendment rights.  *See In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 479 (10th Cir. 2011) ("[T]he First Amendment privilege generally guarantees the right to maintain private associations when, without that privacy, there is a chance that there may be *no association* and, consequently, no expression of the ideas that association helps to foster.") (emphasis added).

To the extent NRRT seeks to protect not just its own internal communications but also communications with "the Republican Party, its state affiliates, and other aligned entities and individuals," that request should independently be rejected because, except for arguably the Republican Party, Kincaid Decl. ¶ 9, NRRT has made no demonstration of its association with these entities.  And Mr. Kincaid's declaration does not describe the nature of NRRT's association with these entities or the extent of their relationship.  Indeed, an open-ended protective order preventing inquiry into NRRT's communications with "other aligned entities and individuals" leaves undefined who those entities and individuals might be, how and why they associate with NRRT, and how any protective order applying to those individuals might be applied in practice.

Even if NRRT has made a *prima facie* case that certain aspects of the Rule 30(b)(6) subpoena could arguably implicate its associational rights, it has demonstrated only a minimal impact at most. The core of the First Amendment privilege is that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association."  *Perry*, 591 F.3d at 1159 (9th Cir. 2010) (quoting *NAACP v. Alabama,* 357 U.S. 449, 460 (1958)).  Mr. Kincaid's declaration does not state that NRRT's interest in

14

maintaining the secrecy of its communications is because of an interest in advocacy; nor does

Mr. Kincaid identify NRRT as an advocacy organization.  Instead, Mr. Kincaid identifies

NRRT's activities as "provid[ing] advice, litigation support, data collection, and data analysis

throughout the 2020 redistricting cycle."  Kincaid Decl. ¶ 9.  Underscoring this role, Mr.

Kincaid's declaration states that NRRT's involvement in Texas' redistricting is pursuant to an

agreement to provide support services entered into with The Gober Group, Kincaid Decl. ¶¶ 6-7,

which in turn was engaged by members of Texas's congressional declaration, *see* NRRT

Contract, *supra*.  In other words, NRRT is here in its role as a contractual service provider to

political candidates, not as a freestanding expressive organization.  *See, e.g.*, Gober Tr. 50:11-18;

55:12-17; *see also* Sept. 26, 2021 Email from Adam Kincaid to Gail Gitcho and Chris Gober

(Ex. 2) ("Chris [Gober] is representing the Congressional Delegation in Texas and has hired us

as a subcontractor.").

　　　This is not a motion asserting the core First Amendment associational interests protected

in prior cases.  NRRT does not suggest that otherwise nonpublic membership, supporters, or

donor lists would be exposed, subjecting members to potential retaliation or harassment.  *Cf.,*

*e.g.*, *NAACP*, 357 U.S. at 462; *Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459

U.S. 87, 96-97 (1982), *AFL-CIO v. FEC*, 333 F.3d 168, 176 (D.C. Cir. 2003); *Int'l Action*

*Center*, 207 F.R.D. at 2 (subpoena that sought "extraordinary" breadth of information, including

"[t]he political activities of Plaintiffs except" those that occurred in connection with the relevant

events, the identities of persons who "associate[d] with" plaintiffs in connection with political

activities, including "anonymous or non-public 'members' or 'affiliates,' the identities of

anonymous participants in a political demonstration, and contributor lists and lists of "political

activities or causes supported by Plaintiffs").  Nor does Mr. Kincaid or anyone else associated

with NRRT assert that their "personal political and moral views" would be newly exposed by permitting any deposition questions here, or that they would no longer associate with the organization if the information is disclosed.  *See Perry*, 591 F.3d at 1147, 1163; *see also Ohio A. Philip Randolph Inst. v. Householder*, No. 1:18-cv-357, 2019 WL 3288170, at *5 (S.D. Ohio Jan. 30, 2019) (three-judge court) ("The information likely to be sought . . . differs considerably from that protected in *Perry*.  Kincaid's testimony would likely not be so much about substantive political campaign messaging (the campaign playbook), but instead will likely relate or pertain to the formulation of the districts in which subsequent campaigns will take place (the setting of the playing field)."), *vacated as moot*, 802 F. App'x 185 (6th Cir. 2020).

Weighed against the asserted First Amendment associational interest, LULAC and the United States have a substantial need for the challenged discovery.  This is a case involving claims of intentional discrimination in redistricting.  Unlike cases where the information sought is "attenuated" from the core claim, *see Perry*, 591 F.3d at 1145, here the intent of the individuals and groups drawing legislative maps is a core issue in the case.  *See, e.g.*, *Busbee* v. *Smith*, 549 F. Supp. 494, 500-15 (D.D.C. 1982) (three-judge court), *aff'd*, 459 U.S. 1166 (1983).  NRRT willingly and voluntarily participated directly in Texas' redistricting, working as subcontractors for Texas congresspersons in that process, and Mr. Kincaid was a key player in drawing Texas' congressional maps, *see supra*.  NRRT cannot now assert that its activities while doing so are beyond discovery in this case, particularly where there is no alternative means to discover NRRT's explanation of its own intent for particular redistricting choices.  *Cf., e.g.*, Gober Tr. 58:19-22 ("[Q.] Did Mr. Kincaid or anybody at NRRT communicate directly with a Member of Congress? A. I cannot testify on behalf of Mr, Kincaid or NRRT as to what communications may have been made.").

A protective order limiting the scope of NRRT's deposition is also unwarranted and unnecessary. As explained above, because NRRT has not shown that its responses to deposition questions would cause the asserted reluctance to communicate internally because of a demonstrable impact on its First Amendment associational rights, there are no grounds to limit the scope of the NRRT deposition based on a First Amendment privilege. And the burden on any arguable First Amendment rights is limited and insufficient to overcome the need to obtain discovery from NRRT. Moreover, NRRT has not carried its burden to make a "specific demonstration of facts," *Huthnance*, 255 F.R.D. at 296, that a protective order is needed because it has not provided any basis to conclude that LULAC or the United States will inquire into the topics over which it asserts a First Amendment privilege. NRRT's deposition will already explore the 30(b)(6) topics that are focused on Texas redistricting, *see supra* Part III.A; further limitations are unnecessary.

The arguments NRRT raises here echo arguments that Mr. Kincaid unsuccessfully advanced in 2019, during partisan gerrymandering litigation in Ohio. *See Ohio A. Philip Randolph Inst. v. Householder*, No. 1:18-cv-357, 2019 WL 3288170, at *1-2 (S.D. Ohio Jan. 30, 2019) (three-judge court) (denying motion to quash deposition and denying in part and granting in part protective order), *vacated as moot*, 802 F. App'x 185 (6th Cir. 2020); *see also Ohio A. Philip Randolph Institute v. Smith*, 360 F. Supp.3d 681, 687 (S.D. Ohio 2018) (three-judge court) (describing affidavit stating disclosure of documents would "'drastically and adversely affect' how [Mr. Kincaid and other subpoena recipients] communicated in the future"), *vacated as moot*, 802 F. App'x 185 (6th Cir. 2020). While the relevant orders were ultimately vacated as moot, the analysis is instructive. In the Ohio litigation, the three-judge court found that Mr. Kincaid had not shown his testimony would "associate him with an organization with which he

17

previously had no public ties," and that he had "not expressed any concern that his deposition

might subject him to harassment or retaliation—the kinds of chilling effects with which the First

Amendment privilege is primarily concerned." *Householder*, 2019 WL 3288170, at *4.

Although the court found his First Amendment interests were "arguably implicated to some

extent" because disclosure of internal communications might "cause him and members of his

organizations to be more cautious about candidly expressing their thoughts and plans," it

described those interests as "insubstantial," *id.* at *6, and largely outweighed by "what exactly is

at issue here: communications and deposition testimony related to the process of and factors

involved in drawing the district lines themselves, which are centrally at issue in this case, not

purely internal communications about a candidate's campaign strategy and the like," *id.* at *5.

Thus, given the need to prove intent in that case and the fact that Mr. Kincaid was "one of the

primary draftsmen of the congressional map," the court found the interest in disclosure

outweighed any First Amendment interest.  *Id.* at *6 (internal quotation mark omitted).[9]

### C.  NRRT Has Not Identified Protected Trade Secrets.

Finally, NRRT cannot use the Federal Rules' grant of authority to this Court to quash or

modify a subpoena to protect a party from disclosing a "trade secret" to avoid answering

deposition questions in this redistricting action.  NRRT asserts that "communications and

activities within the broader NRRT organization" may constitute trade secrets under Rule

---

[9] The *Householder* court granted in part a protective order to limit the scope of Mr. Kincaid's deposition to "center on issues related to proving the various elements of specific claims at issue in this case—understanding Kincaid and his associates' roles in designing, drafting, directing, consulting on, or in any way influencing the congressional district maps in Ohio."  *Id.* at *7. However, it also warned the parties "not to parse this limitation too finely."  It cautioned that, for example, a conversation need not have been "to or about the Ohio state legislative apparatus as narrowly construed" to be permissible to discover, or that "simply because certain conversations or mental impressions encompassed efforts involving both Ohio and other states together does not mean they are not appropriate for exploration at this deposition."  *Id.*

45(d)(3)(B)(i).  This provision protects from disclosure or dissemination "the type of commercial information that should not be disclosed to the public."  *Albany Molecular Rsch., Inc. v. Schloemer*, 274 F.R.D. 22, 25 (D.D.C. 2011).  But redistricting considerations, methods, or strategies—that is, the drawing of lines that determine the districts in which voters will vote for their elected representatives—are not "commercial information," and this argument therefore fails at the threshold.[10]  In any event, NRRT has made no showing that answering any conceivable deposition question would disclose commercial secrets that would "unfairly harm [its] ability to compete in [a] marketplace" or "unfairly harm [its] financial health."  *Id.*  To the extent NRRT is asserting that its redistricting activities are somehow proprietary technical or commercial information, it has made no showing of what the market is or how this information would be used.  Nor has it made any showing why a substantially less restrictive means of protecting "trade secrets" from public disclosure than fully cutting off discovery into this information in a constitutional and Voting Rights Act redistricting action—where the other parties are not alleged to be competitors in a commercial marketplace, no less—would not suffice.[11]

## CONCLUSION

For the foregoing reasons, the Court should deny Mr. Kincaid's and NRRT's motions to quash and for protective orders.

---

[10] To the extent that the NRRT relies on its contract with The Gober Group to suggest a commercial function, the modest one-time fee for months of technical services is incommensurate with such value deriving from confidential commercial information.  In fact, it is at best a fig leaf.  The NRRT is a political party entity whose staff were fully available to Mr. Gober and his political clients.  *See, e.g.*, Email from Parker Carey, National Republican Congressional Committee, to Chris Gober et al. (Aug. 13, 2021) (Ex. 3).

[11] NRRT's argument that its redistricting communications are commercial "trade secrets" also undermines its argument above that this information implicates core First Amendment associational rights.

Date:  July 26, 2022

JOHNATHAN SMITH
Acting Principal Deputy Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Acting Deputy Assistant Attorney General
Civil Rights Division

*/s/ Michael E. Stewart*
T. CHRISTIAN HERREN, JR.
TIMOTHY F. MELLETT
DANIEL J. FREEMAN
MICHAEL E. STEWART (D.C. Bar No. 144926)
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(800) 253-3931
michael.stewart3@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on July 26, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of this filing to all counsel of record.

*/s/ Michael E. Stewart*
Michael E. Stewart
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
(800) 253-3931
michael.stewart3@usdoj.gov
